## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INTEGRATED BUSINESS PLANNING ASSOCIATES, INC., an Illinois corporation,<br><br>    Plaintiff,<br><br>v.<br><br>OPERATIONAL RESULTS, INC., a Delaware corporation,<br><br>    Defendant. | **MEMORANDUM DECISION & ORDER (AMENDED) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00733-JNP-CMR<br><br>District Judge Jill N. Parrish |

Through this action, Integrated Business Planning Associates, Inc. ("IBP2" or "Plaintiff") asserts claims for breach of contract and under the Utah Sales Representative Commission Payment Act against Operation Results, Inc. ("ORI" or "Defendant"). Before the court is ORI's Motion for Partial Summary Judgment, ECF No. 28 ("Mot."). For the reasons set out below, ORI's motion is **GRANTED IN PART AND DENIED IN PART**.

### FACTUAL BACKGROUND

This action centers on the business relationship between IBP2 and ORI. IBP2 is a consulting firm that focuses on supply chain planning. ORI is a consulting and software-as-a-service company. The parties' dealings go back to at least 2016, when IBP2 and ORI entered into their first mutual referral agreement, in which each agreed to pay referral fees for new customers and business referred by the other. ECF No. 28-3 ("2016 Agreement").

In 2018, the parties executed a new agreement, largely based on the 2016 Agreement, but with some modifications. ECF No 28-4 ("2018 Agreement"). The 2018 Agreement forms the basis for IBP2's breach-of-contract claim against ORI. *See* ECF No. 1 ("Compl.") ¶ 30.

The 2018 Agreement creates an ostensibly perpetual entitlement to referral fee payments held by a referring party according to an agreed-upon payment schedule. 2018 Agreement §§ 12, 15; *id.*, Ex. A §§ 2, 4(a). The Agreement outlines particular terms and processes restricting the parties' entitlement to referral fees under the Agreement. Namely, the contractual provisions identified in Exhibit A of the 2018 Agreement are applicable to referral fees as defined by section four of the Agreement. An entitlement to these referral fees is created where a referred party "enters into a contract with a New Sales Lead or otherwise provides products and/or services to a New Sales Lead[.]" *Id*. § 3.

Such New Sales Leads, the Agreement states, are to be identified as a New Sales Lead and communicated by the referring party to the referred party "through electronic mail via a format mutually agreed to by the parties." *Id*. § 2. Section two continues to read that "[e]ach party will have fifteen days to accept or reject a New Sales Lead. If the Referred Party does not provide written acceptance (electronic mail is acceptable) of the New Sales Lead within fifteen days after submission, then the New Sales Lead shall be deemed rejected." *Id*.[1]

In addition to being subject to being "deemed rejected" as New Sales Leads by the referred party, referrals of such New Sales Leads are also vulnerable to expiration and

> becom[ing] null and void without the requirement of written notice thereof, and no longer subject to the payment of any Referral Fee, in in the event that the New Sales Lead has not become a customer of the Referred Party (as evidenced by a signed

---

[1] By implication, the court understands that rejection of such New Sales Leads unambiguously defeats any entitlement to referral fees under the 2018 Agreement.

purchase agreement) within one (1) year from the date of the written approval of the New Sales Lead. Referrals which have so expired shall no longer be subject to the opportunity for any Referral Fee.

*Id*. § 5.

Thus, a referring party's entitlement to Referral Fees under the 2018 Agreement is ostensibly subject to at least three agreed-upon terms or conditions:

(1) Such Referral Fees must have been generated from New Sales Leads properly identified and communicated "via a format mutually agreed to by the parties," *id*. § 2;

(2) Such New Sales Leads must have been accepted or approved by the referred party within fifteen days of such identification and communication, *id*.; and

(3) Contracts with such New Sales Leads (from which the Referral Fees would be paid under the Agreement) must be executed, meaning that the New Sales Leads become customers of the referred party, within one year from the date of the written approval of the New Sales Leads by the referred party. *Id*. §§ 3, 5.

In its motion, ORI moves for partial summary judgment as to the application of the 2018 Agreement to seven customers referred to it by IBP2.[2] On September 24-25, 2018, a representative from ORI sent IBP2 an email with a list of "companies we accept as New Sales Leads from IBP2," including the seven customers. *See* ECF No. 28-5 at 3.

Because the sales contracts with the first four of these customers were all signed more than one year after this purported acceptance email (which IBP2 argues did not satisfy the contract terms), ORI argues that the referrals expired. ORI also argues that the latter three customers are

---

[2] For the purposes of this amended order, these customers will be referred to by a roman numeral corresponding to numbering in the sealed version of this order. *See* ECF No. 59 (filed under seal).

outside of the terms of the Agreement because they were already ORI customers at the execution of the 2018 Agreement.

Although ORI previously paid IBP2 referral fees for the seven customers at issue here, it has since changed course, arguing that it was under no legal obligation to do so, and that the prior payments were the result of a mistake regarding its contractual duties. *See* Mot. at 4. Thus, ORI now requests that this court interpret the terms of the 2018 Agreement to determine, as to those seven customers, ORI's obligations. Although IBP2 points to the potential applicability of other agreements to these customers,[3] the court, in this order, considers only the 2018 Agreement pursuant to ORI's motion. ORI also seeks a determination of the applicability of the remedial provisions of the Utah Sales Representative Commission Payment Act, UTAH CODE ANN. § 33-44-101 *et seq*. ("Act" or "Utah Act").

For the reasons laid out below, ORI's motion is **GRANTED IN PART AND DENIED IN PART**.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is

---

[3] These include the 2016 Agreement and an agreement entered into by the parties in 2019, the Software Services Agreement, ECF No. 35-5 ("2019 Agreement" or "2019 Pilot Agreement"), which, under IBP2's interpretation, created an additional avenue for IBP2 to collect a referral fee from ORI.

genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation omitted). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (cleaned up).

In any case, a plaintiff "must still identify sufficient evidence requiring submission to the jury," *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *accord Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005), where such evidence offered is in admissible form. *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1191 (10th Cir. 1998). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

ORI seeks rulings that: (1) ORI was not obligated to pay referral fees to IBP2 under the 2018 Agreement for certain customers or, in the alternative, that ORI was only required to pay referral fees incurred during the three-month period preceding IBP2's November 2, 2022 demand

for payment; and (2) the Utah Act does not apply to IBP2 either by its text or because it is unconstitutionally void for vagueness. Mot. at 2. The court begins by considering the text and structure of the 2018 Agreement before turning to the constitutionality and applicability of the Utah Act, which are discussed at greater length below.

As to ORI's argument on the boundaries of the Referral Fee obligation created by the 2018 Agreement, IBP2 rebuts (a) by offering competing interpretations of the 2018 Agreement; (b) by arguing that certain provisions of the 2018 Agreement are ambiguous, thus precluding partial summary judgment as to any obligations arising from it; and (c) by offering theories of contractual liability stemming from other agreements entered into by the parties.

Because ORI's motion only seeks to construe the terms of the 2018 Agreement (and attendant obligations it might face arising under that Agreement alone), this court is not compelled to construe the other agreements or offer any commentary on what rights or liabilities may have been created thereby (or, for that matter, whether such contracts are sufficiently integrated into the Complaint as to be properly pleaded bases of liability in the instant action).[4] Instead, the court resolves the narrow question raised by the motion: putting all else to the side, does the 2018 Agreement create a basis for liability for the seven customers identified by ORI in its motion?

When interpreting a contract under Utah law,[5] a court begins by looking to the plain language of the contract to determine the parties' meaning and intent. *Brady v. Park*, 2019 UT 16,

---

[4] The court acknowledges that many portions of ORI's motion suggest that it seeks general rulings on its liability to IBP2. *See, e.g.*, Mot. at 12. However, this court nonetheless understands ORI's reply memorandum as clarifying that it moves only as to the construction of the 2018 Agreement. *See* Reply Mem. at 8. Thus, the court relies on this clarification.

[5] The 2018 Agreement contains a choice-of-law provision specifying that it shall be governed by Utah law. *See* 2018 Agreement § 18.

¶ 53, 445 P.3d 395. Where such language within the four corners of the contract is unambiguous, the contract may be interpreted as a matter of law. *Johnson v. Schnabel*, 2023 UT App 102, ¶ 14, 536 P.3d 1147. However, where there are two or more reasonable interpretations of a contractual provision (meaning that such provision is ambiguous), "[a] determination of the parties' intent based on extrinsic evidence is a factual determination that should be made by the fact-finder." *Brady*, 2019 UT 16, ¶ 56.

### I.      New Sales Leads in Question

Regarding IBP2's breach claim, ORI argues that it is entitled to summary judgment as to its contractual liability under the 2018 Agreement relating to Referral Fees for seven customers for which IBP2 claims a fee entitlement. ORI argues that the referrals for each of the first four of these referred customers expired, while the latter three are outside of the terms of the Agreement because they were already ORI customers at the execution of the 2018 Agreement.[6]

### A.  Section 5 (Expired Referrals, Pilot Customers)

ORI argues that IBP2 is not entitled to any Referral Fee under 2018 Agreement as to customers (i)-(iv) because each referral expired under section three of the Agreement insofar as the contracts between each New Sales Lead and ORI were signed longer than one year from the date on which such leads were accepted by ORI. Mot. at 12.

i)      IBP2 Response 1: 2019 Pilot Agreement

IBP2's first response regarding the allegedly expired customers—which IBP2 would have characterized instead as the "Pilot Customers"—is that, regardless of the 2018 Agreement, IBP2

---

[6] While IBP2, in response, raises the issue of four additional customers, this order only addresses the seven customers identified by ORI in its motion.

is entitled to referral fees for customers (i)-(iv) by the operation of the 2019 Pilot Agreement. ECF No. 35 ("Opp'n Mem.") (filed under seal) at 22. Thus, IBP2 contends that ORI "simply ignores the Pilot Agreement[.]" *Id.* at 22.

But because ORI moves only as to the construction of the 2018 Agreement, this court declines to opine at this juncture on the legal effect of the 2019 Pilot Agreement—including whether its terms create a payment obligation for referral fees as to customers (i)-(iv) *or* whether such agreement is properly pleaded as a basis for breach-of-contract liability in IBP2's operative complaint.

### ii)    IBP2 Response 2: Mutually Agreed Method

As a second line of defense, IBP2 argues that the 2018 Agreement required, before the one-year expiration provision could become effective or begin to run, "that the parties mutually agree[] on a format for submission of New Sales Leads." Opp'n Mem. at 25. Here, IBP2 points to section two of the 2018 Agreement, which states that a referring party "will communicate the potential customer through electronic mail *via a format mutually agreed to by the parties*; identifying such potential customer as a 'New Sales Lead.'" 2018 Agreement § 2 (emphasis added).

Absent such a formal agreement as to the proper procedure, IBP2 argues that the one-year limitation never kicked in. Because ORI has not presented evidence showing that the parties "agreed on a referral procedure so as to trigger the one-year limitation period or intended that a one-year limitation barred any of the Referral Fees at issue in this Motion," IBP2 contends that the one-year limitation is inapplicable as to customers (i)-(iv). Opp'n Mem. at 25.[7]

---

[7] IBP2 also makes an argument regarding the possibility that customers could be resubmitted as referral leads. Opp'n Mem. at 25. However, there is no apparent indication that this hypothetical

But IBP2's approach stretches the language of the agreement to create novel contractual duties where none are apparent from the text. Section two of the Agreement is not reasonably read as mandating an additional procedure requiring future agreement before the expiration limitation in section five is effective. That section two refers to a "format mutually agreed to by the parties" (after reference to electronic mail) does not create a hurdle preventing section five's limitation period from operating as stated, which begins at the referred party's written approval/acceptance of the New Sales Leads upon presentation by email. *See* 2018 Agreement §§ 2, 5.

Further, IBP2 does not seem to dispute that ORI purported to accept the leads in this way, even if there were some uncertainty as to the parties' desired *modus operandi* in managing the referral logistics. *See* Opp'n Mem. at 3, ¶ 5. ORI's principal, Mr. Brant Slade, accepted the leads by email, stating "[h]ere are the companies we accept as New Sales Leads from IBP2" and listing the customers at issue here. *See* ECF No. 28-5 at 3. Under the plain text of section five, the one-year limitation began to run when Mr. Slade accepted the New Sales Leads in response to their presentation by email.

In short, under the terms of 2018 Agreement, there is no genuine dispute as to any material fact regarding customers (i)-(iv), and ORI has demonstrated an entitlement to partial summary judgment: the 2018 Agreement did not create contractual liability for a referred party to pay referral fees on customers whose Sales Lead Contacts were executed later than one year following the referred party accepting such leads in writing via email. Accordingly, ORI is entitled to summary

---

ought to apply to customers (i)-(iv), that the limitation was properly restarted, or that there was any such resubmission here.

judgment on its claim that IBP2 is not entitled to any referral fee under the 2018 Agreement for customers (i)-(iv).

## B.  Section 2 (Unqualified Leads, Prior Referrals)

Second, as to customers (v)-(vii), ORI contends that IBP2 is not entitled to Referral Fees under the terms of the 2018 Agreement because these customers were already customers of ORI with contracts in effect before the execution or effective date of that Agreement. Mot. at 13.[8] While its motion suggests that it seeks summary judgment as to whether IBP2 is entitled to referral fees broadly, ORI's reply memorandum clarifies that it moves only as to the rights and obligations created by the 2018 Agreement, and the court, in turn, limits its analysis to that Agreement.

As to these customers—the purportedly unqualified leads constituting customers (v)-(vii)—IBP2 puts the cart before the horse in its opposition memorandum. IBP2 first argues that no term of the 2018 Agreement terminates any previously existing entitlements to referral fees otherwise created between the parties. Opp'n Mem. at 23. Although IBP2 recognizes that, "once triggered," referral fees "continue indefinitely," IBP2 is less clear in identifying the *source* of the underlying obligation. *See id*. at 24.

Without expressly stating as much, IBP2 ultimately seems to argue that the 2016 Agreement created a performance obligation as to any referrals generated thereunder (which obligation was to survive the termination of that agreement), and that the 2018 Agreement did not terminate such obligation. But an argument that the 2018 Agreement did not modify or obviate

---

[8] ORI refers to these customers as "unqualified leads," while IBP2 calls them "prior referrals." The court uses both terms for the purpose of this order.

such an entitlement is conceptually distinct from one that the 2018 Agreement itself created such an entitlement.

In relevant part, section 4(a) of Exhibit A of the 2018 Agreement states that "Referral Fee Payments will commence upon first receipt of payment from Customer and will continue in perpetuity until Customers['] final payment." This language does not refer to the 2016 Agreement and provides no indication that it constitutes a promise to pay referral fees for previously generated referral arrangements. Thus, regardless of whether any previous agreement between the parties created an obligation to pay referral fees for these customers, the 2018 Agreement—the subject of this motion—did not, and ORI's motion is thus **GRANTED** on this issue, except as to customer (vi), considered in the next subpart.

i)      Customer (vi)

IBP2 argues that customer (vi) is factually distinguishable from the other so-called prior referrals because it entered into a contract with ORI after the effective date of the contract. As IBP2 points out, the customer (vi) contract that ORI attached as an exhibit to its motion indicates that it is effective October 1, 2018. ECF No. 28-7. ORI presents testimony that this contract was merely a revised version of a previously executed contract. ECF No. 28-2 ¶ 8(b). IBP2, in turn, presents testimony to the contrary, that customer (vi)'s first ORI contract for services became effective on October 1. ECF No. 35-2 ¶¶ 13-14. The evidence thus does not point but one way, and summary judgment is inappropriate as a result. *Genberg v. Porter*, 882 F.3d 1249, 1253 (10th Cir. 2018).

Thus, ORI has failed to demonstrate an entitlement to summary judgment as to the applicability of the 2018 Agreement to customer (vi), and its motion on that point is **DENIED**.

## C.  ORI's Payment Demand Theory

In the alternative, ORI points to section 16 of the 2018 Agreement as limiting IBP2's referral fee entitlement to those "referral fees that ORI owed to IBP2 that were incurred since August 2, 2022—three months before IBP2 asserted its claim." Mot. at 15. ORI thus argues that "the amount owed," in section 16, unambiguously means the amounts "incurred." *Id*.

The court, however, disagrees. ORI's proffered interpretation of this provision does violence to the term "owed." In its ordinary sense, an amount owed is merely an amount yet to be paid. *Owing*, BLACK'S LAW DICTIONARY (11th ed. 2019). And the amount *owed* (that is, the amount that is yet to be paid) during some three-month period may include outstanding charges incurred prior to that period—especially where the 2018 Agreement, like the 2016 Agreement, expressly states that referral fee entitlements "continue in perpetuity until Customers['] final payment." 2018 Agreement Ex. A § 4(a). While ORI is vigilant about reading the three-month language out of the Agreement, they seem unphased by the prospect of effectively substituting the term "owed" for "incurred" by post hoc interpretation.

Whether or not ORI's proposed interpretation is one reasonable interpretation of the contractual langauge—including the one that the fact-finder might determine is appropriate—need not be reached here. Instead, finding that ORI's proffered interpretation is, in fact, not the unambiguous meaning of the relevant portion of section 16, the court need go no further than hold that ORI has not demonstrated an entitlement to summary judgment on this ground.

## D.  IBP2's Waiver Argument

Finally, the court considers IBP2's argument that ORI has waived any objections to its obligations to pay referral fees for customers (i)-(vii). *See* Opp'n Mem. at 30. Under Utah law, waiver is an equitable remedy. *AL-IN Partners, LLC v. LifeVantage Corp.*, 2021 UT 42, ¶ 22, 496

P.3d 76. Generally, courts "do not lightly consider a contract provision waived." *Id*. (quoting *Mounteer Enters. V. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 18, 422 P.3d 809). In order to establish waiver, there must be "an intentional relinquishment of a known right," whether it be express or implied. *Id*. ¶ 22 (cleaned up).

Where, as here, a contract contains an antiwaiver provision, a "party must show not only clear intent to waive the underlying provision, but also the intent to waive the antiwaiver provision." *Id*. ¶ 28. An express oral waiver suffices to waive both the underlying performance provision and the antiwaiver provision, even where the contractual language demands waivers be in writing. *Id*. ¶ 30. "[A]ffirmative conduct" may also be sufficient to waive both layers of the contract. *Id*.

But the purportedly express waivers identified by IBP2 (as well as the affirmative conduct discussed in its memorandum) do not suffice to show such an intentional relinquishment of any known rights held by ORI. In fact, IBP2 uses the language of waiver to seek something very far-removed from waiver properly understood. Waiver, of course, is the abandonment of a legal *right* or advantage—such as an entitlement to *demand performance* required by a contract. *Waiver*, Black's Law Dictionary (11th ed. 2019).

Thus, IBP2 or ORI could, theoretically, *waive* an entitlement to demand referral fees. But what IBP2 seeks here is not the recognition that some obligation created by a contract has been abandoned by ORI, but, rather, that ORI has *assumed* an obligation to pay referral fees through its words or conduct.[9] But ORI cannot waive itself into contractual liability or create contractual

---

[9] IBP2 suggests that ORI has "waived any objection" to the contested fees. Opp'n Mem. at 30. But this is essentially an *estoppel* argument (that a party ought to be equitably estopped to denying a

13

obligations where none existed before—either the 2018 Agreement created an obligation to pay referral fees for certain referred customers or it did not. Thus, IBP2's waiver argument is doctrinally off-point and inapt.

But even assuming, *arguendo*, that waiver is at issue in the first place, conduct tending to show ORI's acknowledgement of *some* contractual duty to pay referral fees for the customers at issue does not necessarily speak to the proper construction or interpretation of the 2018 Agreement—especially where, as IBP2 argues, *other contracts* may provide the proper basis for the liability in question.

ORI's words or conduct ostensibly acknowledging an obligation to pay referral fees for certain customers may be easily squared with the existence of obligations under the 2016 and 2019 Agreements and do not meaningfully affect the proper interpretation of the 2018 Agreement, the parties' understanding thereof, or the balance of the equities regarding that agreement. Thus, the court declines to exercise its equitable powers to find waiver at this juncture.

## II.    Sales Representative Commission Payment Act

IBP2's second cause of action is pleaded under the Utah Act, which provides that "[a] sales representative may bring a civil action in a court of competent jurisdiction against a principal for failure by the principal to comply with [] any provision of an agreement relating to the payment of commission." UTAH CODE ANN. § 34-44-301(1)(a). The Act additionally provides an entitlement for treble damages, reasonable attorney fees, and court costs for successful plaintiffs. *Id*. § 34-44-301(2).

---

payment obligation), not a *waiver* argument (which would demand that ORI has abandoned its ability to demand performance from IBP2).

In its motion, ORI argues that the Act does not provide IBP2 with any such entitlement for at least one of three reasons: (1) because the Act doesn't apply to IBP2 because IBP2 is a corporation; (2) because section 16 of the 2018 Agreement precludes any such damages multipliers as provided by the Act; and/or (3) because the Act is unconstitutionally vague. Each is discussed in turn.

### A. The Act's textual applicability to IBP2

ORI first argues that the Act is inapplicable to the instant dispute because IBP2 is not a "sales representative" protected by the Act, and therefore can't bring an action under its terms. Mot. at 15.[10] The Act defines "sale representative" to mean "a person who enters into a business

---

[10] At oral argument, ORI raised novel arguments on the applicability of the Utah Act to the parties in this action. That is, ORI argued that the Act's definitions of "business relationship" and "principal," in conjunction with the definition of "sales representative," exclude any sort of reciprocal sales commission relationships like the one created by the 2018 Agreement, and, by their plain text, could only refer to a one-way, fixed relationship between principals and sales representatives. *See* UTAH CODE ANN. § 34-44-102(1), (4), (5).

As was expressed at argument, however, the court is of the initial view that ORI attempts to force elephants into textual mouseholes, creating substantial carveouts from the Act's application through its proposed interpretation. ORI's attempts to read so much meaning into the text is particularly striking where they have *already* moved this court to find that the Act is unconstitutionally void for vagueness. That is, ORI simultaneously argues that the text is rich in meaning *and also* so meaningless as to provide no real rule or standard at all.

However, as this court has previously stated, federal courts need not, and traditionally do not, consider arguments raised for the first time at oral argument. *See Deseret Tr. Co. v. Unique Inv. Corp.*, 2018 U.S. Dist. LEXIS 239267, at *9 (D. Utah July 2, 2018) (collecting cases). This is, of course, a means of respecting the basic adversarial structure of the Anglo-American legal tradition and preventing unfair surprise to nonmovants at argument.

"This common practice promotes fairness and efficiency. Last-ditch arguments thrown out pell-mell at a motion hearing deprive party-opponents of any reasonable opportunity to give a thoughtful, supported response. And routinely considering such arguments would necessitate additional briefing and additional argument—all of which should have come in the first round of timely filings." *Id*.

relationship with a principal [] to solicit orders for a product or a service described in Subsection (4)(a); and [] under which the person is compensated, in whole or in part, by commission." UTAH CODE ANN. § 34-44-102(5)(a)(i)-(ii).

Because, ORI argues, it is "contrary to common speech" to call "a corporation" a person, it would have this court declare that the use of the term "person" in the Act either doesn't apply to IBP2 or otherwise renders the definition of sales representative ambiguous. Mot. at 15.

ORI is, to say the least, cutting against the grain in its proffered interpretation of the statutory text. The Utah legislature has *already* defined "person," as it appears *anywhere* in the Utah Code, to include corporations. UTAH CODE ANN. § 68-3-12.5(18)(d). Allowing the legislature's selected definitions to operate in the Act certainly is not inconsistent with any "manifest intent" of the legislature, even if it may be contrary to ORI's interests. *See id*. § 68-3-12.5(1)(a). Further, it is well-accepted—even axiomatic—that corporations are generally within the ambit of the legal term "person." *See, e.g.*, *Supreme Laundry Service, LLC v. Hartford Casualty Insurance Co.*, 521 F.3d 743, 747 (7th Cir. 2008).

The court declines to disturb such well-settled definitional tradition or the legislature's election to define its terms as it sees fit. The term "person" as used in the Act unambiguously includes corporations, and resort to the legislative history is therefore uninstructive and unnecessary. *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 ("When we can ascertain the intent of the legislature from the statutory terms alone, no other interpretive tools are needed, and our task of statutory construction is typically at an end.") (internal quotation marks omitted).

---

Thus, the court limits its ruling on the textual meaning of the Act to the grounds addressed in ORI's motion and meaningfully briefed by both parties.

Additionally, ORI's broad resort to the term definitions, and argument that such definitions might be construed broadly, is an insufficient basis for this court to breach the text of the Act and inquire into legislative history as a means of rewriting clear text. Such generalized vagueness arguments are best considered below in conjunction with ORI's constitutional challenge.

### B.  Section 16 of the 2018 Agreement

Second, ORI points to section 16 of the 2018 Agreement as barring any damages modifiers, including those that would be permitted by the Act. Mot. at 19. ORI argues that, in the face of section 16, "the parties agreed that, in their mutual relationship, neither was entitled to seek the type of treble damages allowed under the Act." Mot. at 19. However, the Act itself seems to contemplate exactly this sort of attempted contractual workaround. In fact, the Act voids any "express waiver of any right under this chapter" in an agreement between a sales representative and a principal. UTAH CODE ANN. § 34-44-104(1).

Because section 16 purports to voluntarily and intentionally waive the parties' rights otherwise available under the Act, the court understands it to be void insofar as it conflicts with UTAH CODE ANN. § 34-44-301's remedial provisions. Parties are generally free to bind their own hands and agree to certain remedial limitations through contract, even "contract[] away" their statutory rights. *Howick v. Salt Lake City Corp.*, 2013 UT App 218, ¶ 46, 310 P.3d 1220. Here, however, the Utah legislature has manifested a clear, governing intent to void any such contractual provisions, and this court is bound thereby. In so doing, the legislature exercised a powerful veto over parties' contracting power, and section 16 of the 2018 Agreement cannot evade such a trump card by identifying itself as essential to the bargain.

17

### C.  Whether the Act is void for vagueness

As a last line of defense, ORI argues that this court should rule that the Act is unconstitutionally vague under the United States Constitution. Mot. at 20. But the standard of clarity demanded from statutes by the Constitution is much lower than ORI seems to argue. The void-for-vagueness doctrine is primarily operative in the criminal law and applied in the context of penal laws. *United States v. Gaudreau*, 860 F.2d 357, 359 (10th Cir. 1988). Although it is at play in the analysis of civil laws as well as penal ones, "[t]o find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)).

If persons of reasonable intelligence can derive a core meaning from a civil statute, it is not unconstitutionally void for vagueness. *Id.*; *accord Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015). ORI's citation to penal-vagueness, *e.g.*, *Lanzetta v. New Jersey*, 306 U.S. 451 (1969), and First Amendment overbreadth-vagueness cases, *Jordan v. Pugh*, 425 F.3d 820 (10th Cir. 2005), are irrelevant and uninstructive.

With the correct standard for vagueness in the civil arena in mind, this court lacks any doubt that the Act passes constitutional muster and is not facially invalid for vagueness, including as it would be interpreted by the Utah courts. *See Gaudreau*, 860 F.3d at 361. As IBP2 argues, persons of ordinary intelligence would have no difficulty understanding the nature and demands of the statutory language in the Act. Regardless of whether the Act may potentially regulate a

broad swath of economic conduct, as ORI recognizes, it is not unconstitutionally vague in doing so. Mot. at 20.[11]

At bottom, the statute is certainly not so vague as to really be no rule or standard at all. ORI's argument as to unconstitutionality is unavailing, and its motion as to IBP2's claim under the Act is **DENIED** in all regards.

## CONCLUSION

As set out above, ORI's Motion for Partial Summary Judgment, ECF No. 28, is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

(1) Referrals for customers (i)-(iv) expired under the terms of the 2018 Agreement, and ORI's motion regarding the inapplicability of the 2018 Agreement to these customers is **GRANTED**;

(2) Referral fee liability for customers (v) and (vii) was not created by the 2018 Agreement, and ORI's motion regarding the inapplicability of the 2018 Agreement to these customers is **GRANTED**; except that

    a. ORI has failed to demonstrate an entitlement to summary judgment regarding customer (vi);

---

[11] In the penal context, vagueness challenges must be made as applied to the facts at hand before a facial challenge can be considered. *United States v. Morales-Lopez*, __ F.4th __, 2024 U.S. App. LEXIS 3051, at *7 (10th Cir. Feb. 9, 2024). The Tenth Circuit has suggested that this procedural demand may be in effect wherever a vagueness challenge "does not implicate First Amendment values." *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997).

Thus, the court independently declines to grant summary judgment on the basis of ORI's vagueness challenge because facts as they may be developed at trial will no doubt be of assistance in determining whether the statute clearly applies to IBP2's and ORI's business relationship. *See United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010).

(3) ORI has failed to demonstrate an entitlement to summary judgment on the limitation of its liability under section 16 of the 2018 Agreement; and

(4) ORI's motion is **DENIED** in all regards as to the Utah Sales Representative Commission Payment Act.

DATED June 5, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge