IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INTEGRATED BUSINESS PLANNING ASSOCIATES, INC., an Illinois corporation,<br><br>Plaintiff,<br><br>v.<br><br>OPERATIONAL RESULTS, INC., a Delaware corporation,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00733-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is Defendant's motion for partial summary judgment on its counterclaims. ECF No. 80 ("Def.'s Mot."). Plaintiff Integrated Business Planning Associates, Inc. ("Plaintiff" or "IBP2") filed this action against Defendant Operational Results, Inc. ("Defendant" or "ORI") alleging claims for breach of contract and violation of the Utah Sales Representative Commission Payment Act. For the reasons set forth herein, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This action stems from the business relationship between IBP2 and ORI. IBP2 is a business consulting firm that specializes in supply chain and logistics. ORI is a software company that developed a Software-as-a-Service ("SaaS") platform to assist companies in supply chain planning and business processes. During their relationship, IBP2 agreed to provide customer referrals to

ORI in exchange for a referral fee. IBP2 alleges that ORI failed to pay these referral fees, in violation of the parties' contracts and Utah law.

## I. The Contracts Between the Parties

Three contracts form the basis of IBP2's breach of contract claim. First, the parties signed a Mutual Referral Agreement in 2016 ("the 2016 Agreement"), memorializing ORI's agreement to pay referral fees in exchange for IBP2's customer referrals. ECF No. 28-3 ("2016 Agreement"). In 2018, the parties modified the agreement and executed a new Mutual Referral Agreement ("the 2018 Agreement"). ECF No. 104-1, Exhibit 2 ("2018 Agreement"). Finally, the parties entered into a Software Services Agreement in 2019 ("the 2019 Agreement") which, among other things, granted IBP2 a license to use ORI software in providing consulting services to their clients. ECF No. 204-1, Exhibit 3 ("2019 Agreement").

### a. The Mutual Referral Agreement

The Mutual Referral Agreement, first signed in 2016 and then updated in 2018, governs the parties' customer referral relationship. Under the contracts, IBP2 agreed to refer customers to ORI in exchange for referral fees. Both Agreements define the process whereby a customer becomes a referral account subject to fees, although the 2018 Agreement differs slightly. The 2018 Agreement provides

> When the Referring Party identifies a potential customer for the other party's services, it will communicate the potential customer through electronic mail via a format mutually agreed to by the parties; identifying such potential customer as a "New Sales Lead". Each party will have fifteen days to accept or reject a New Sales Lead. If the Referred Party does not provide written acceptance (electronic mail is acceptable) of the New Sales Lead within fifteen days after submission, then the New Sales Lead shall be deemed rejected.

2018 Agreement ¶ 2. Neither Agreement defines "New Sales Lead" as a term. Both Agreements also have an expiration clause that states

> Referrals shall expire and become automatically null and void without the requirement of written notice thereof, and no longer subject to the payment of any Referral Fee, in the event that the New Sales Lead has not become a customer of the Referred Party (as evidenced by a signed purchase agreement) within one (1) year from the date of the written approval of the New Sales Lead. Referrals which have so expired shall no longer be subject to the opportunity for any Referral Fee.

2018 Agreement ¶ 5; 2016 Agreement ¶ 5.

### b. The Software Services Agreement

In 2019, the parties executed a contract titled "Software Services Agreement." The Agreement designates IBP2 as the "Licensee" and "governs Licensee's access to and use of any ORI website, mobile application, or content, or products and/or services made available by ORI (collectively and individually, the 'Services')." 2019 Agreement at 1. The contract "also governs the use of the Services by any third-party user to whom Licensee makes the Services available through a sublicense or otherwise, for whom Licensee is responsible as if Licensee had directly taken the action taken by any of Licensee's sublicensees or employees." *Id.*

The Agreement prohibits IBP2 from using the Services "for any purpose other than its own internal business purposes, except in the case where it is acting as a consultant to a third party, in which case, the use must be limited to the scope of the consulting provided to the third party." *Id.* at 2. Thus, IBP2's license is limited to its use of ORI's Services (i) on IBP2's own account and (ii) on behalf of IBP2's clients and sublicenses. *Id.*

Notably, IBP2 characterizes the 2019 Agreement differently than ORI. IBP2 claims the 2019 Agreement was a "Pilot Agreement" in that it "allowed a potential customer to access and

use the ORI Software during a trial period through a license paid by IBP2." Pl.'s Opp. at 16. But the contract never mentions the word "pilot" or "trial period." ORI responds that the 2019 Agreement merely "granted a license for IBP2 to use ORI's Software for itself and for its consulting clients." ECF No. 78 ("Def.'s Reply") at 7.

## II. Procedural History and Defendant's Pending Motion

In March 2024, the court ruled on Defendant's earlier motion for partial summary judgment regarding what referral fees were owed under the 2018 Agreement. ECF No. 59 ("MSJ Order"). The court granted partial summary judgment, holding that all but one of the customers included in Defendant's motion were either expired referrals or unqualified for a referral fee split fee under the 2018 Agreement. Because ORI moved only for construction of the 2018 Agreement, the court did not consider ORI's obligations under the 2016 Agreement or the 2019 Agreement.

Now, ORI asks the court for summary judgment on what referral fees were owed under the 2016, 2018, and 2019 Agreements. First, Defendant requests a monetary award of $1,067,160 in referral fees ORI claims it accidentally paid to IBP2. Second, Defendant requests a declaratory judgment that "referral fees are not owed for customer referrals that did not comply with the referral process prescribed in the parties' Mutual Referral Agreement." Def.'s Mot. at 2. Finally, Defendant requests an award of prejudgment interest on the referral fees it mistakenly paid. This time, Defendant's motion is not limited to its obligations under the 2018 Agreement. Thus, the court will also consider ORI's obligations under the 2016 and 2019 Agreements.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the

4

initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS

Defendant moves for partial summary judgment on its counterclaims. Specifically, it requests a declaratory judgment that it does not owe referral fees for the following customers: (i) ███████, (ii) ███████████ (iii) ██████████, (iv) ████████████ (v) ██████████ (vi) ████████████ (vii) ████████ (viii) ████████ (ix) ██████████ and (x) ████████. It then requests a monetary award of those referral fees mistakenly paid to IBP2 under a theory of restitution. The court first addresses whether ORI does indeed owe referral fees it paid for customers (i)-(x). It then considers whether a monetary award of those fees mistakenly paid is appropriate at this stage in the litigation.

## I.   WHETHER ORI OWES REFERRAL FEES

Defendant argues three reasons as to why it does not owe referral fees. First, ORI contends that it does not owe referral fees for customers (i)-(iii) and (x) because these customers were expired under the terms of the 2018 Agreement. Second, it argues referral fees are not owed for customers (iv)-(vi) because those customers preexisted the 2018 Agreement. Finally, ORI maintains that customers (vii)-(x) did not qualify as a "New Sales Lead" under the 2018 Agreement and thus referral fees were not owed for those customers. The court addresses each of these arguments in turn.

### A.   Expired Customers

ORI argues that it does not owe referral fees for customers (i)-(iii) and (x) because the referrals for these customers expired under the terms of the 2018 Agreement. Because Defendant also argues that it does not owe referral fees for customer (x) because that customer is unqualified, the court will address customer (x) in Section C below. The court thus proceeds with customers (i)-(iii).

Under the 2018 Agreement, a customer will no longer qualify for a referral fee if an ORI SaaS contract is not executed within one year of that customer being identified as a New Sales Lead. 2018 Agreement ¶ 5. Here, IBP2 identified customers (i)-(iii) as New Sales Leads in an email on September 24, 2018. ORI accepted them as New Sales Leads the following day. A year passed before any of the customers executed a SaaS agreement with ORI. These facts are undisputed. Because customers (i)-(iii) did not sign a contract with ORI within one year after they were accepted as "New Sales Leads," ORI concludes these customer referrals expired.

IBP2 responds that the expiration clause does not apply to customers (i)-(iii) because they were designated "pilot customers" under the 2019 Agreement. Specifically, Plaintiff points to the

6

provision in the 2019 Agreement which states, "When IBP2 converts an account into a fully executed SaaS agreement with ORI, that account ... will then become subject to the terms and conditions in our referral agreement and therefore subject to our referral fee split." 2019 Agreement at 8. IBP2 argues that "when a Pilot Customer transitioned from the Pilot Program . . . to a SaaS contract with ORI, IBP2 became entitled to the [] Referral Fee under the 2018 Agreement" regardless of whether the SaaS contract had been signed within one year of the New Sales Lead acceptance. Pl.'s Opp. at 27.

Plaintiff is partially correct. But it deliberately fails to consider the entire clause it cites from the 2019 Agreement. True, an account would be subject to the referral fee split once it is converted to a fully executed SaaS contract with ORI. However, the provision is clear that the account will also be subject to the terms and conditions of the 2018 Agreement—terms that include the expiration clause. Therefore, under the plain reading of both contracts, customers (i)-(iii) would not be eligible for referral fees because one year lapsed from when they were designated "New Sales Leads" to their execution of a SaaS contract with ORI.

But IBP2 argues that the court should not interpret these contracts in accordance with the plain text because it would lead to absurd results. *See Center for Excellence in Higher Education, Inc. v. RSUI Indemnity Co.*, 375 F. Supp. 3d 1217, 1226 (D. Utah 2019). IBP2 claims that it conducted pilot programs with customers exceeding one year and paid up to $200,000 in licensing fees to ORI to do so. IBP2 maintains that it "would have no incentive to conduct these lengthy Pilot Programs and pay hundreds of thousands of dollars to ORI, if it was not assured of a Referral Fee for those Pilot Customers that ultimately converted to a contract with ORI." Pl.'s Opp. at 28. But not every "pilot program" conducted by IBP2 had to be one year. In fact, Plaintiff admits that some were not. *See id.* ("IBP2 conducted a nine-month Pilot Program with [a client] during which

7

it paid ORI license fees . . ."). Further, IBP2 conveniently disregards the benefit it received in using ORI's software in the course of its consulting work. The 2019 Agreement allowed IBP2 to use ORI's platform to enhance the consulting services it provided to its clients by not only obtaining a license to use it on their own account, but on account of their clients. And limiting the time in which IBP2 could earn a referral fee provides an incentive for IBP2 to convince its client to sign a contract with ORI sooner rather than later.

There is also no evidence to suggest that the 2019 Agreement was signed in conjunction with the Mutual Referral Agreements as IBP2 purports it to be. The provision Plaintiff cites to support its conclusion that the 2019 Agreement served to establish a pilot program is not in the main text of the contract but rather a side note on the second to last page. *See* 2019 Agreement at 8. Reading the provision in context, the note serves to clarify that sublicensees are not referrals and therefore not subject to a referral split fee. These sublicensees or clients of IBP2 only become subject to a referral fee when they sign a SaaS agreement with ORI. The main purpose of the 2019 Agreement is to grant IBP2 a license and sublicense for its clients to use the ORI platform in the course of its consulting work. It does not establish a pilot program, nor does it set up a "trial period" for potential customers. And it certainly does not modify the 2018 Agreement or its expiration clause. Thus, IBP2 is not entitled to referral fees for customers (i)-(iii) under the 2016, 2018, or 2019 Agreements because these customers expired. The court GRANTS IN PART Defendant's motion for summary judgment with respect to referral fees owed for customers (i)-(iii). The court will address whether Defendant may recover these fees in Section II below.

### B. Preexisting Customers

Defendant argues that customers (iv)-(vi) do not qualify for referral fees because they executed a SaaS contract with ORI prior the execution of the 2018 Agreement. But prior to the

2018 Agreement, the 2016 Agreement was in effect. Thus, these customers may have been subject to referral fees deriving from the 2016 Agreement. In its reply, ORI argued that IBP2 failed to plead a claim under the 2016 Agreement and is therefore not entitled to any claims originating from the 2016 Agreement. IBP2 subsequently amended its complaint to include the 2016 Agreement in its breach of contract claim, thereby correcting any failure to plead a claim under this contract. ECF No. 102 ("Pl.'s Am. Compl.") ¶ 49-57.

Still, ORI contends that the 2018 Agreement cancelled any referral fees owed under previous contracts because it specified that it "replaces and supersedes all preceding agreements between the parties." 2018 Agreement at 1. Indeed, the 2018 Agreement replaced the earlier 2016 Agreement. But it did not dispose of ORI's obligation to pay referral fees under the 2016 Agreement. In fact, the 2016 Agreement states, "[a] Referring Party's right to receive Referral Fees arising from New Sales Leads submitted to the other party prior to termination of this Agreement shall survive the termination of this Agreement." 2016 Agreement ¶ 12. Thus, IBP2's *entitlement* to referral fees survived termination of the 2016 Agreement. And Defendant has not demonstrated that there is no dispute of fact as to whether customers (iv)-(vi) qualified for referral fees under the 2016 Agreement.

ORI responds that IBP2 consistently invoiced it for these customers under the 2018 Agreement, as evidenced by the referral percentage charged in IBP2's billing. The 2016 Agreement provides that IBP2 is entitled to receive ▮ of referral fees "[f]or the first ▮ (USD) of total actual monthly revenue generated." 2016 Agreement, Exhibit A ¶ 2(a). The 2018 Agreement does not provide such a cap. ORI argues that this demonstrates IBP2 recognized that these customers fell under the 2018 Agreement and therefore IBP2 should not be entitled to receive fees for these customers under the 2016 Agreement. IBP2 responds that it did charge those referrals

9

correctly under the 2016 Agreement because none of the clients met the ▊ cap. In its reply, ORI contends that the ▊ cap did not apply to each customer, but the total monthly revenue. Regardless, the court need not reach whether this is the correct interpretation of the 2016 Agreement. Even if IBP2 charged the referral fee under the incorrect percentage, a reasonable juror could interpret that as a mistake, not an admission or recognition that only the 2018 Agreement applies to customers (iv)-(vi). Thus, the court DENIES IN PART Defendant's motion for summary judgment with respect to referral fees owed for customers (iv)-(vi).[1]

### C. Unqualified Customers

Defendant next argues that IBP2 is not entitled to referral fees for customers (vii)-(x) because they do not qualify under the terms of the 2018 Agreement. Here, Defendant also requests declaratory judgment that referral fees are not owed for any customer referrals that did not comply with the referral process. ORI contends this referral process requires IBP2 to identify these customers as "New Sales Leads," using that exact term, and ORI must properly accept these customers in writing.

The 2018 Agreement defines the process by which an account becomes a referral customer subject to fees. First, IBP2 must identify a New Sales Lead "through electronic mail via a format mutually agreed to by the parties." 2018 Agreement ¶ 2. Then, ORI must accept that New Sales Lead within 15 days in writing. *Id.* If ORI has not accepted that New Sales Lead within 15 days in writing, that customer does not become subject to a referral fee under the 2018 Agreement.

---

[1] Of note, the court already denied summary judgment with respect to customer (vi) in its previous motion. MSJ Order at 11. IBP2 submitted evidence demonstrating a dispute of fact as to whether customer (vi)'s SaaS contract may have been executed after the 2018 Agreement went into effect. Thus, customer (vi) may be subject to referral fees under the 2016 or 2018 Agreement.

IBP2 does not dispute that it failed to identify a new customer using the exact phrase "New Sales Lead." It also does not dispute that ORI never specifically stated in email correspondence that it accepted customers (vii)-(x) as New Sales Leads. Instead, IBP2 argues that the contract does not require such a technical adherence to the referrals process. IBP2 insists that "[t]hroughout the parties' years of working together, ORI never stated or suggested to IBP2 that in order for IBP2 to be entitled to the Referral Fees on the customers it was referring to ORI, IBP2 needed to specifically identify those customers using the particular language of 'New Sales Leads,' which term is undefined in the 2018 Agreement." Pl.'s Opp. at 29. IBP2 further argues that it did identify New Sales Leads, albeit without using the exact language of "New Sales Lead." ORI, IBP2 claims, accepted these customers as New Sales Leads by agreeing to connect with them over email for the purposes of setting up a contract to use the ORI platform. IBP2 also adds that it frequently provided ORI with referral lists and informed ORI about customers in various stages of the sales cycle through email correspondence and meetings. IBP2 points to the fact that ORI gladly accepted these referrals and acknowledged an obligation to pay the fee as evidence that such strict compliance with the referral process as outlined by Defendant was not necessary.

Indeed, the plain reading of the contract does not mandate the Referring Party use the magic words, "New Sales Lead." It only mandates that the Referring Party "identify[] such potential customer as a 'New Sales Lead.'" 2018 Agreement ¶ 2. Thus, the contract is ambiguous as to whether the parties must use this exact term or whether they can identify a customer as a New Sales Lead without using that specific language. In other words, there is ambiguity in the contract as to what the parties understood would meet the requirement of identifying a customer as a New Sales Lead.

Under Utah law, where a contract is ambiguous, "the court may consider the parties' actions and performance as evidence of the parties['] true intention." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990). IBP2 maintains that the parties never intended their fulfillment of the referral process requirement to require such technical adherence. Thus, there remains a dispute of fact as to what the parties understood would fulfill the referral process requirement in the 2018 Agreement. And "a motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983). Indeed, the intent of the parties regarding the referral process under the 2018 Agreement "is a question of fact to be determined by the jury." *Plateau Mining*, 802 P.2d at 725. Thus, the court DENIES IN PART Defendant's motion for summary judgment with respect to customers (vii)-(ix) as well as Defendant's declaratory judgment request.

For customer (x), ORI argues that even if IBP2 met the referral process requirement, IBP2 would still not be eligible for referral fees because the customer (x) account expired under the terms of the 2018 Agreement. IBP2 first raised the possibility of customer (x) using ORI software in an email on February 28, 2022, to which ORI responded on March 4, 2022 that it would support that request. Customer (x) did not sign a purchase agreement with ORI until April 26, 2023. Even assuming the email exchange on February 28, 2022 and March 4, 2022 met the referral process requirement for identifying a referral account, ORI did not execute a contract until more than a year later. IBP2 did not offer any evidence disputing this fact. Therefore, even if customer (x) was properly identified as a New Sales Lead under the 2018 Agreement, there is no dispute that customer (x) executed an ORI contract more than a year after that identification. Thus, customer (x) would have expired under the terms of the 2018 Agreement. And IBP2 would not be entitled

12

to referral fees for customer (x). Thus, the court GRANTS IN PART summary judgment with respect to referral fees owed for customer (x).

* * *

In sum, the court GRANTS IN PART summary judgment with respect to referral fees owed for customers (i)-(iii) and (x) and DENIES IN PART summary judgment with respect to referral fees owed for customers (iv)-(ix). Finding IBP2 is not entitled to referral fees for customers (i)-(iii) and (x) under the 2016, 2018, or 2019 Agreements and ORI mistakenly paid those fees to IBP2, the court next turns to whether ORI may recover those fees under a theory of restitution.

## II. WHETHER AN AWARD OF REFERRAL FEES IS APPROPRIATE

IBP2 argues that ORI has not met its burden under restitution theory to compel a refund of referral fees mistakenly paid to IBP2. Although recovery under a theory of restitution is generally not available where a contract exists, the Tenth Circuit held that "[r]estitution may be available to conform to the terms of a written contract when one party overperforms." *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 484 (10th Cir. 2023); *see also Hillcrest Inv. Co. LLC v. Department of Transp.*, 352 P.3d 128, 133 (Utah Ct. App. 2015) ("Our case law . . . supports the proposition that even where there is an express contract, an equitable claim may be viable, under specific factual circumstances, if the equitable claim is based on a separate representation or misleading act arising independently of the express contract."). Because ORI's claims involve a repayment of fees that IBP2 was *not* entitled to under the contract, the existence of a contract does not prevent ORI's recovery under a theory of restitution. Indeed, ORI's mistaken payment of fees falls outside of the parties' rights and obligations governed by the contract. Therefore, Defendant requests recovery of fees under a theory of unjust enrichment.

13

To prove a claim of unjust enrichment under Utah law, a party must show three elements. *Allen v. Hall*, 148 P.3d 939, 945 (Utah 2006).

> First, there must be a benefit conferred by one person on another. Second, the conferee must appreciate or have knowledge of the benefit. Third, there must be acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.

*Id.* Whether a party has been unjustly enriched is "a mixed question of law and fact." *Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998). Thus, unjust enrichment requires "the application of a legal standard to a particular set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). A motion for summary judgment on a mixed question of law and fact can only be granted if "reasonable minds cannot differ" on the answer to the mixed question. *Id.*; *see also Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764 (holding that a mixed question of law and fact "can be decided as a matter of law if reasonable minds could not differ on the question." (internal quotation marks omitted)).

Here, ORI conferred a benefit on IBP2 in the form of referral fees and IBP2 had knowledge of that benefit conferred. However, IBP2's retention of those referral fees may not necessarily be inequitable. After all, when viewing the facts in the light most favorable to Plaintiff, IBP2 did introduce these clients to ORI who ultimately signed contracts to purchase its software, albeit too late to receive referral fees under the contract. And IBP2 argues that "an otherwise applicable restitution obligation does not apply where, as here, the party seeking restitution benefitted from the other party's performance." Pl.'s Opp at 33. The court agrees. At this stage, reasonable minds may differ as to whether IBP2's retention of the referral fees was unjust. Further fact development is required. Thus, the court cannot grant summary judgment on repayment of referral fees at this time. The court therefore DENIES IN PART summary judgment with respect to the repayment of

mistakenly paid referral fees for customers (i)-(iii) and (x) under a theory of restitution. Therefore, the court also DENIES IN PART summary judgment for prejudgment interest on those fees.

## CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**:

(1) IBP2 is not entitled to referral fees for customers (i)-(iii) and (x) under the 2016, 2018, or 2019 Agreements;

(2) Triable issues of fact exist as to whether IBP2 was entitled to referral fees for customers (iv)-(ix) under the 2016, 2018, or 2019 Agreements;

(3) Triable issues of fact exist as to whether IBP2 was unjustly enriched by ORI's mistaken payment of referral fees for customers (i)-(iii) and (x).

DATED March 27, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge